Good morning. The first matter of that panel we'll hear this morning is Port Authority v. the Secretary. And my understanding is that the appellants have divided their time. The petitioner says have their respondents. Ms. Lee, you will go first and have ten minutes. Is that correct? Yes, Your Honor. And five minutes for Mr. Johnson. Yes, Your Honor. You may proceed. May it please the Court, my name is Megan Lee and I represent Port Authority Trans Hudson v. the Department of Justice. I would request your Honor to bring me your ballot signs. Great. Your Honor, the decision by which this app violated 20109C on a suspended municipal ballot for three days for excessive absenteeism after he missed 95 work days due to a non-work-related injury and had a prior history of poor attendance is wrong for four reasons. First, the text of 20109C-2 unambiguously does not protect employees from discipline for attendance issues where their absences were due to a non-work-related injury. Second, the decision of the Department of Labor is not entitled to the art, is not entitled to a Chevron deference because the art offers shifting positions for its statutory interpretation of 20109C in Santiago and ballot, among other reasons. Third, even if the Court determines the statute is ambiguous, the art's interpretation of the statute is unreasonable based on the clear language and purpose of the statute, the legislative history, and the decision's far-reaching impact on the railroad industry. Finally, even if the statute applies, Mr. Ballard failed to present substantial evidence that the decision-maker had knowledge that he was engaging in a protected activity when they elected to discipline. All right. We don't even need, in our eventual adjudication or opinion, to read the word Chevron if we can resolve this matter purely textually, right? Yes, that's correct, Your Honor. Okay. Can you tell me exactly what you believe is meant by the phrase, following orders were a treatment plan of a treating physician, as it appears in C-2? I think it's our position that C-2, regretting and judging C-1, means C-1 says that the railroad can't interfere with an employee who gets injured on duty and requests medical treatment. And then C-2 says it only makes C-2 as the protection for them requesting that treatment. C-1 says they're prohibited as a railroad from interfering. And C-2 is that you can't discipline someone for getting injured. And, in fact, each of the subsections are denominated that way. Prohibition and then the other. Which is something that really wasn't discussed by either party or the ALJ or the ARP. The titles of each section, one is explicitly what is prohibited. And the other is the discipline when there is a violation of what is prohibited. Correct? Yes, Your Honor. The titles, to me speaking only for myself, have significance and it really hasn't been extricated by the parties or by the agency. Everybody quotes fragments from C-1 and fragments from C-2. But you're dealing with very specific prohibited conduct and very specific discipline for violation of that C-1. And I agree, Your Honor, and that that is precisely our point. C-1 talks about... Well, I think Judge Perry's question was it hasn't been your point that you've made very... It's not been as clear as it should be if you look at the titles of these sections. Well, I apologize if we weren't clear about it in our papers. But clearly C-1 is prohibitions. C-2 are the discipline. Well, and in addition to that, the entire subsection, C, is denominated prompt medical attention. We all know that you can't read titles or headaches, as the case may be, in a manner that would be inconsistent with the explicit language. But clearly one candidate of construction is that where it's helpful, where the language is susceptible to needing some interpretation, they can be helpful. Doesn't that, having prompt medical attention, contribute something to your understanding of the entire statutory structure, C-1 and C-2? Yes, Your Honor, because the prompt medical attention addresses the concern that was being raised here that injured, railroad employees injured on duty were being denied medical treatment. And so prompt medical attention clearly applies to on-duty injuries. If somebody's injured off-duty, the railroad wouldn't get involved in providing prompt medical attention. I'm not going to make a request about the first sentence of C-2 because there is a disjunctive used. That is, there cannot be disciplinary discipline to an employee for requesting medical or first-aid treatment. And that strongly suggests, at least to me, something that occurs at the workplace. I'm not going to make a request at home. But the disjunctive then or for following orders for a treatment plan of a treating physician. And the requesting suggests something to medical or first-aid treatment, but the disjunctive would seem to be another concept altogether. I think it's the concept that once you go and get the medical treatment, you should not be disciplined for following what the doctor's treatment is. Well, you had a doctor's order here that he was supposed to remain off work, right? And he was terminated despite that, or disciplined despite that. He was disciplined because of excessive absences. How did it challenge the fact that he was off-duty? Oh, I don't know about that. He hadn't received a warning letter on other absences for four years. He was disciplined for not showing up that day. He was disciplined for a very specific instance, I would suggest. In fact, he has a history of absenteeism, but not a history of a record of discipline. Isn't that the case here? They had made written counseling memos to him when he had been absent in the past, and those are part of the record. But the last one of those, the warning letter, I think was four years earlier. I thought there was one in 2007. Well, I don't have a count. Okay. And this was in 2008. But when it talks, with reference to Judge Smith's question, when you're talking about treatment and treatment plan, isn't the only way to read that, a treatment and treatment plan, And you're talking about return to work a little later. For someone who was injured on the job, what was treated as a result of that injury under the plan, that was a treated physician. Yes. So it fits, doesn't it? I think it fits, yes, Your Honor. I mean, I think that 201C2 flows directly from C1, and it has to do with injuries during the course of employment. And if you go back to 201A4, and I know that's not the provision we're talking about here, but A4 is what the employees get protection for. And they added in A4 to say that you get protection if the railroad, if the employee attempts to notify the railroad carrier or the secretary of transportation of a work-related personal injury or work-related illness of an employee. Sure. But the pushback to that, of course, is, well, Congress knew how to say it in A4. Why didn't they make it patent in C2? Well, he was injured at home with the boxes, right? Yes. So that isn't on the job. Right. But, correct. And I think that C flows from A, Your Honor. I think that, and that's why I think the ballot board made the, made a mistake. Because when they read A4, they dropped the language, work-related, and they said A4 just applies to reporting an illness or injury, which is not the way the statute's written. Well, the, well, the board has a very interesting, inconsistent manner of interpreting this statutory provision to, given the Santiago reading. Tom, do you have? No. All right. Well, we've gone over your time, and we will have you back in rebuttal. Mr. Johnson. Thank you. I'm going to address the same line of questions that the Court has already started with. First of all, I'm Ron Johnson, here from the U.S. Association of American Railroads. And the reason we're here, there's a quote we have from Justice Scalia from the case that says that Congress does not hide elements in mouse holes. But in that mouse hole, they manage to pull out this unlimited right to, simply, for employees of the railroad industry, as long as they have a doctor's note. Acknowledging that you, you are not suggesting that C2 is a model of clarity, are you? No, I'm not suggesting that, Your Honor. We think that when you read C2 together with C1, and you read it together with A4, we think it is clear from the language that they did not intend to reach the non-workplace environment. In C2, which is what we've been talking about, there are four separate protections. And by the way, I agree with what you're saying about it could have been better, all this addressing the sometimes prohibition and discipline. But they ought to actually get a better job than any of the parties in talking about that in Santiago. If you go back to Santiago, they talk about what they refer to as the parallelism between subparts A, B, and C of 219C. And they talk about how in this parallelism, in subparts A and subparts B, they start out with prohibitions and then they follow up with discipline. And Santiago talks about how Congress did that in C, but not as perfectly as it did in A and B. Which gets to the point, you know, there could be more clarity in C. But in C, there are four separate protections, if you will, for employees. In C1, there's the protection of you can't interfere, deny, or delay prompt medical treatment during the course of employment. The second protection in C1 is if an employee requests you, you have to promptly transport the person to a hospital injured during the course of employment. In C2, there are two separate aspects that you can't discipline the employee for. The first one, we talked about already with Ms. Levy, is you can't discipline the employee for requesting first aid or medical treatment. And then there's the disjunctive, or following the treatment plan or orders of the physician. The phrase, you cannot discipline the employee for requesting first aid or medical treatment, that exact same phrase, first aid or medical treatment, is used in subpart 1 in prohibitions. And we think the only logical thing here is that it's intended to refer only to medical treatment resulting from a workplace injury or illness. And because they're not going to request medical first aid or treatment from the employer, and the government and none of the other parties, none of them deny that the first discipline, the first protection in C2 is limited to workplace injuries. And it doesn't make any sense to argue that a scope of C2 is, you know, a workplace for requesting, but it's broader. And that you would jump within the course of just a sentence or one clause in a sentence to the next. Exactly. To be workplace and then not workplace. I mean, you ask Ms. Levy, well, what's meant by the treatment plan or orders of the physician? We think, and we think it makes common sense, is you're talking about the treatment plan that results from a request for medical treatment from a workplace injury. What about Rosello? The board made much of the Rosello decision. Well, they made much of the Rosello decision because that's their only argument. They have. A Supreme Court opinion on statutory obstruction is nothing. It is. And if you read that Supreme Court decision, what that Supreme Court decision says, what lots of those Supreme Court decisions say, what this Court's decisions say, is you use all the ordinary tools of statutory obstruction. And the Supreme Court did that in Rosello. They looked at the statutory context as a whole. They looked at the legislative history, and they also applied it in Rosello canon, but not in the abstract. And they said we have to be careful about it. Now, here it doesn't apply because there are other indications in the statutory language, in the legislative history, that shows that the interpretation in that kind of a cell is not intended. But the government's alignment on Rosello is based on a false premise. Their premise is that C1 and C2 are completely distinct subjects. They set up a false premise, and then they applied Rosello to that. But as the discussion we've been having this morning shows, C1 and C2 are not totally separate. They're interrelated, and they're part of the larger structure of 2109, which is aimed at preventing retaliation for workplace activities. I just want to mention one more quick thing about Rosello, and we point this out in our briefs. The government's being inconsistent here because they rejected the Rosello canon in Santiago, where they held that the argument was false. Although they didn't explicitly cite to Rosello. They didn't mention the name of the case. But the principle that is applied is applied completely differently in the two cases. Well, on that point, if I may, they were ordering the AOJ on it. Right. And the AOJ mentioned Rosello. I'd forgotten that. Thank you. All right. Thank you very much, Mr. Johnson. Mr. Gardner, you represent the board, and you are also splitting your time, 10 minutes and 5 minutes, with Mr. Gatch. That's correct. All right. Thank you. That's correct, Your Honor. May it please the Court, I'm going to speak to Gardner. I represent the Secretary of Labor. Your Honor, as we all know, we just discussed Section 201.9, where he was disciplining an employee to, quote, follow orders or treatment plan of a treating physician. His language is clear, and it establishes that if an employee, like Mr. Mala, is ordered out of an order by his treating physician, then he or she can't be disciplined for that absence. Well, you agree we have to read that in context. Right? I can't read that in a vacuum. I would agree on that issue because it can't be read in context. Context includes C-1. It does not. But Section C-1 and C-2 are the same provisions. I would disagree with what was just said. They need to be read together. C-1 deals with interference. Obviously, as we know, prohibited to interfere with a medical or first-day treatment of an employee. It was a job injury. It was an injury during the course of employment. That's exactly right, Your Honor. All right. So you disagree with the temporal premise, the notion that 1 applies to the immediate medical attention and that C-2 applies to some continuing course of care. You disagree with that. Yes, Your Honor. All right. Then let's talk about B. Subsection B is entitled Hazardous Safety or Security Conditions. You're familiar with that, right? Yes, Your Honor. All right. So what about an employee who is very active in reporting a hazardous safety condition in the neighborhood? Let's say it's cancer-causing pollution. And the employee so vigorously opposes that hazardous condition regarding the plants nearby that the railroad reprimands him at work. Does he have a cause of action? Your Honor, maybe not. I think the point that you're getting is whether the provision that you're speaking to incorporates the course of employment limitation in the next section. And we would argue that it doesn't. Well, that's correct. But I'm asking, why doesn't he have a cause of action? Why can't he sue the railroad because he reported in good faith a hazardous safety condition? Because the plan language of that section does not, just like C-2, does not include the course of employment. There's no employment limitation in that hazardous activity section. Now, as a practical matter, I'm not aware of any case that's ever come up. But this doesn't, this is not limited to, this doesn't say reporting in good faith a hazardous safety or security condition at the railroad. It's unlimited. There's no scope of employment language of limitation at all in me. So how can you say that he doesn't have a cause of action?  He's out there dealing with something entirely unrelated to the railroad, but he's wearing a PATH sweatshirt. And he does shame to the PATH organization by his conduct at that power plant that he can sue under 2-1-1. Yes, Your Honor. But again, and I think that's consistent with our interpretations of C-1 and C-2. Just to kind of talk about what Your Honor spoke of earlier, I know there was a concern, first of all, about the title, and how this idea of making enough attention, having to make it a title, and this notion that prompt medical attention, doesn't that suggest that there's a limitation to workplace injuries? And we would assert that that's somewhat not the case. First of all, the headings don't help you at all, do they? I mean, how can prompt medical attention, for example, the primary heading of sub-C, help you in any way? Well, there's two examples, Your Honor. Number one, an employee who has been injured off the job, who knows that if he goes to see his treatment physician or her treatment physician... The promptness of medical attention for a railway worker can have significance only if it's an on-the-job injury or condition requiring medical attention. Respectfully, I would disagree. An employee who has suffered an injury and wants to go to his treatment physician, but decides, you know what, I can't go to my treatment physician, because if I'm over and out of work, then I will have to choose between being disappointed or disobeying my doctor, is now denying prompt medical attention. He's not going to go see prompt medical attention. But he's not protected unless that occurs on the job. Are you seeing what I'm seeing? Are you seeing what I'm seeing? If we give the statute your way, then, strengthly, we're giving greater protection to the person whose rights are infringed upon in the course of treatment than we're giving protection to the person who suffers a grievous injury at the time of injury. If I can interject, it's C1. It is protected from interference. And two, we're only dealing with a discipline. And the employee who was injured on the job, who was denied prompt medical attention, if he's denied that prompt medical attention, he would have interference. But if he was subsequently disciplined for something... Disciplined for something that's not prohibited, is that what you're saying? No, if he was, in this case, if he was absent, we're dealing with, we're dealing with absence. So, C1 is interference. Well, we're not dealing here with a situation where medical treatment was interfered with. We're dealing with where there was a discipline because of the uneven application of an absenteeism policy under C2. And that is what the Secretary, who is in a program, hasn't tried to get us to understand. Now, haven't you conceded that C2 might be read in part, that is, the requesting language, that the requesting medical or first aid treatment could be read as referring to an on-the-job injury or condition arising? No, Your Honor. I know that the act, in its reply, says that the Secretary made that concession. Yes. And that's simply not the case. Now, as a practical matter, it's far more likely the cases are going to involve discipline for fraud in order for treatment to make a treated position. But there are numerous circumstances... It may be a situation where it would not be. So, where the request would be for a non-murder rate of injury. So, he has greater protection under the disciplinary thing than he would have under the... So, for example, one way that has come up is an employee who is injured off the job, who calls his or her doctor to make a medical appointment, but it takes a day in order to have that appointment scheduled. But during that time, the individual has requested medical treatment. That's not a bunch. I understand that that's a hypothetical sequence of events, but how is it a discipline for a request? That's what the statute says, becoming requesting. Exactly, Your Honor. Because if that day that the employee is absent from work, you know, too injured, too sick to work, you know, can't... He doesn't have an appointment. He has requested medical attention, and yet there's still a discipline imposed. And ultimately, this all goes back to... Discipline imposed for making the request, or discipline imposed for not showing up, or discipline imposed for indicating that you can't show up. I still fail to see how your example, your hypothetical example, is discipline for a request. Well, it's the same idea, Your Honor, when Pat argues that the individual isn't being disciplined for following the orders or treatment plan of the physician. It's being disciplined for providing an absenteeism policy. The same kind of argument applies here, which the... If the absenteeism policy is applied to discipline the employee for that one-day absence while awaiting medical treatment, then we would assert that there's a violation. Although, again, the issue that we're dealing with here... Treat him for what? Treat him for an on-the-job injury. It could only mean that. Again, I mean, we're going to finish here again. You know, we've... We've sort of... We've sort of discussed. I think, you know, this Court stated in the A&E v. U.S. case that they... And the flawed discussion brings up what implies, you know, the next so-called negative implication can be. And this Court has said the case for applying it is court-particularly weighty when we're dealing with consecutive sections. And the Supreme Court has noted that there's also a very strong case for applying it when you're dealing with two sections that were added at the same time. And we have both of those conditions here. We have C-1 and C-2. So... But you don't want to express COEs? Is that... From the... From the A&E v. U.S. had to do with applying consecutive sections. They're getting to the consecutive sections of IRS COEs. Let's say we agree with you that there's an ambiguity here. Is there any legislative history, any discussion by Congress, any... Anything to support your position that C-1 applies to... That this was before Congress. It was hashed out. And, you know, this is a history. I don't... You know, I'm not talking about generalized railroad safety and the things you've all referred to us. But specifically making the arguments that you're now making, you and your friend, and discussing it one way or the other. There's nothing. Isn't that because it's so clear? I think that there is some, you know, some of which I have examples on. I'd like to continue with this. All right. At the very inception of this statute, you had two different versions. You had a House version that followed the right-of-way structure that was ultimately adopted. You had a Senate version that collapsed in the one section which did not provide, you know, during the course of... Then the House rejected the Senate language. That's exactly right. It rejected the version that condensed into one paragraph. So they essentially restored the House language in another part of the statute. The House language is the language we have today which has a very coarse implementation in one section, not the other. If the Senate version was adopted, then you wouldn't have that situation. Not only that, but... We have one section. Well, okay. To the extent that the alleged... the hearings that were held, you know, I would concede that point, that there is a broader safety purpose that was behind the statute which is fundamentally undermined if employees who are too injured or whatever... Why is there a broader safety... a broader safety concern behind this? Then why isn't chronic absenteeism a safety concern? I think here, for... in terms of... to address your minor question further, I mean, the Federal Bureau of Safety has intended to promote safety in every area of the railroad operations. The preamble to the Rail Safety Improvement Act which was in 2008, which enacted to undermine, specifically states the broad purpose of preventing fatalities and injuries. And there is testimony throughout the hearings that talks about the desire to prevent human damage and cost of accidents. All of those are undermined if individuals like Mr. Bala, who is, you know, controls and repairs signals for the railroad, if he has to... you know, if he has to go... if he's repairing the signals and he's not even doing it effectively because he's injured. It doesn't matter to the safety of his co-workers. It doesn't matter to the safety of folks taking the train, whether or not the reason he's injured is for an on-duty or an off-duty injury. Critically undermining the statute if employees were required to go to work in the middle of... everybody knew they were too injured to do their work effectively. That just is fundamentally incompatible with the legislative... the safety first legislative purpose here. So you're saying somebody who was lifting boxes and hurt himself still has to go to work, right? Because... and shouldn't have to because railroad safety could be compromised. So any off-duty injury, one can say, well, you don't have to go to work because you... it's not a compromise of general railroad safety. I think it's a more acute concern that it's not a general issue about safety. I mean, there are specific examples. Just a year ago, there was a rail accident in New York with an employee who had a flat sleeper and that... which resulted in a crash. Well, that's not... that didn't occur while on-duty, and yet the result was still devastating. What didn't occur while on-duty? I'm just saying, they only... it's a little bit bad, but they only... on God, they only said it wouldn't be so-called an on-duty injury. I guess we don't have a lot of time. All right. We thank you. We thank you, Mr. Gardner, and we'll hear from... is it... is it Goetsch? Yes, Your Honor. All right. Thank you very much. In the Supreme Court, my name is Charles Goetsch. I represent the intervener, Christopher Mabala. I'm happy to introduce... to address any of the knowledge and contribute to any fact... fact of evidence. I have a more basic question, Mr. Goetsch. How many days of FMLA leave did your client take? At the time, he didn't take any, Your Honor. So, is this case justifying about whether he has to take uncompensated FMLA leave, or... I mean, the notion that we just heard from Mr. Gardner is, he has to make a Hobson's choice between getting fired or showing up and presenting a dangerous condition to the Railroad. It would seem he had another choice, which is to take up to 12 months of FMLA leave. Excuse me, 12 weeks, I believe it is, right? Of FMLA leave. Is that right? If... if he... if he qualified under the terms of that separate statute... Well, how would he? How would he if he... if he suffered a grievous injury at home? How would he not qualify for FMLA leave? Well, because there's limitations of a number of hours worked in the previous 12 months, etc., that could disqualify an employee from... So he had... So... So the absenteeism that he... that he had would... might prevent his ability to get FMLA leave? Yes, and... and or just a number of hours for whatever reason. I'm confused here. Before... he... qualified himself of FMLA, I assume that he was taking a... a certain amount of sick leave that was provided to him through a collective bargaining agreement. Right. There are certain absences that are not counted under the intended discipline policy, such as injuries and so forth. They don't count under the intended policy. This was an absence that was not accepted from the intended policy. And if the... Is it because he had exhausted sick... had he exhausted sick leave? Is that why? No, I... So why didn't he just take sick leave? He didn't take... I mean, that's not his choice. What child superintendent said, go to your doctor, get a note, go to OMS, see Dr. Milley, she's not a treating doctor, but she'll review the doctor's note and approve... You said not to take sick leave? See, it was not within his power to call in sick. I mean, I don't... I have no experience with the railroads industry, so you have to help me. See, I thought... People make fun of me. If these were a taxi case, I'd have something to add. Help me out. I hurt myself on a Sunday night, I think it was. I call in sick. And he couldn't do that? He did. He called in, and then he was ordered to go. And the railroad didn't give him a sick leave? The railroad determines whether or not it's sick leave or not. That's their decision, not his. And here the railroad said, no, this is not a valid sick leave. No, it was... My understanding is that it was classified as sick leave, but... that didn't change the fact that they used his absence for the disciplinary charge. I'm so slippery. I mean, okay, I just want one thing to pick up on your point. Being BA1, a hazardous condition, reporting a hazardous condition, if an employee, well, all employees are subject to rules that you've got to be alert and perform your job safely, etc., etc. For an employee to know that the treating doctor said, you're unfit, you should not go to work. To report that to the railroad is to report the hazardous safety condition that would affect himself, his co-workers, and the public. And it's consistent. So C2 has that or, that disjunctive, which is very important. Because, yes, it's or from the treatment plan of the treating doctor, which goes back to the safety of the entire railroad operation. Is there anything, any other provision of this statutory scheme that would extend coverage or address discipline or address some safety issue that arose out of off-work activity or an off-work injury? Is this the only provision that you are arguing within the statute that provides for some kind of off-the-job or off-work injury or activity? Of the dozen or so activities, only two relate to work-related injuries. C2 does not have that limitation. It goes to the treating plan of the doctor. And that goes back to the safety, the inherent fundamental safety of putting yourself at risk, your co-workers, and the public. And that is the real raw purpose of the statute. That's what it should be read in the context of. If they wanted to say and, they would have said ands. But they said or. And it's against disciplining people for following their treating doctor's orders because they're a dispatcher or a receiver who's got to ride trains or an engineer who's got to run the train who's got, you know, he's fatigued. Whatever it may be, it's a safety-sensitive industry. It's a unitary enterprise with thousands of moving parts. And Congress said the North Star is what is the safe course. The whole purpose of this law is to change the culture from discipline trumps safety to safety trumps discipline. That is the entire purpose. Thank you, Mr. Getsch. Ms. Lee, I believe you have rebuttal. Your Honor, this is not a situation where Mr. Bellows objected to excessive discipline. This is a case where he called in SIP on the night he was supposed to show up for work and said he was going to be out until the end of July. And his supervisor did not say go see your doctor and then quote come to the medical. They tried to reach him because they now had a message from him saying he's going to be out for four to six weeks. So why didn't you give him a sick leave? He got a sick leave, Your Honor. He got 95%. He ran out of it? Or he would have run out of it in the middle of that time span he said he was going to be out? No. Or had he already run out of it over the phone call? He got 13 weeks full pay and 26 weeks half pay. He was on his half pay at that time. So those 95 days he was out, he was paid. PAC only took three days back from him because of the excessive absenteeism that he had been displaying. He was missing 55 days a year on average as compared to the rest of the workers in his group. It was incumbent on PAC to do something because he was putting his co-workers at risk I would submit because they had to do his job either on overtime or pick up his responsibilities. PAC has to be able to have employees who come to work full time. Mr. Bauer wasn't. With respect to whether the FRS, whether the 20109 provided protection for off-duty entries, we submitted this amendment and the statute was silent. When they did the amendments in 2008, the RSIA amendments all dealt with specific workplace safety issues. They required the DOT to have railroads, the DOT was required to, the railroads to develop safe work plans, that was one of the amendments. They required a program to address fatigue at work, that was another amendment. They expanded the mandatory rest periods in the HSA. They granted rule-making authority to the DOT on the HSA. They directed the DOT to develop long-range strategies for reducing railroad accidents and so on. There was nothing, and as Council for the Secretary of Labor conceded, there was nothing in that congressional history, in the hearings, in the amendments. Well, in fact, many of these amendments, or the amendments scheme, really was a follow-up and something of a tracking of the earlier Wendell Ford Act, I believe, that had come about around 2000 or 1999, governing the air, the aircraft, the airline industry. And that was essentially work-related because it arose out of several airline disasters. Your time is up, Ms. Lee. We appreciate both sides. This is not an easy case. It's an interesting case. It's an interesting case also because I didn't want it to seem an esoteric comment. My colleagues, and I don't refer only to the two distinguished colleagues who are sitting on this bench with me today, tend to make a little bit of fun from time to time of the fact that I am from Altoona, Pennsylvania. And I don't think that they realize that the proud history of Altoona, Pennsylvania is that it was once one of the railroad capitals of the world. We are so proud of how far you've come. Thank you very much. I knew it would inspire pride of Judge Perry. We thank counsel for their helpful arguments. We'll take the case under advisement. The famous horseshoe curve. That's right. And once the home of the largest railroad shops in the East and the largest roundhouse in the world.